M. L. URDANGEN, Appellant, v. M. T. EDWARDS et al., Appellees.

**EVIDENCE:   Weight and Sufficiency—Failure to Produce.   Plaintiff's failure to produce testimony which is exclusively in his control, and conclusive on the matters in issue, may furnish ample justification for dismissing the petition.**

**ACCOUNTING:   Mutuality.   He who demands an accounting must, himself, in case of mutual accounts, first make accounting to defendant.**

**EVIDENCE:   Relevancy, Materiality, and Competency — Deposit Book.   The personal bank deposit account of a defendant may become relevant and material on the issue of shortage in the defendant's accounts.**

*Appeal from Webster District Court.*—G. D. THOMPSON, Judge.

NOVEMBER 22, 1919.

SUIT in equity for an accounting. The case was first heard before a referee. The report of the referee found for the defendants. The trial court sustained the report, and dismissed the petition. Plaintiff appeals.—*Affirmed.*

*Mitchell & Files,* and *Healy & Faville,* for appellant.

*Price & Burnquist,* and *Healy & Thomas,* for appellees.

EVANS, J.—I.   The plaintiff has, for many years, operated a chain of clothing stores, under the name of New York Brokerage Company. The only apparent reason for

1. EVIDENCE:
   weight and
   sufficiency:
   failure to
   produce.

the name is that the plaintiff has no New York connection, is not engaged in brokerage, and is not a company. The chain of stores includes one at Fort Dodge and one at Mason City, where the plaintiff resides. The store at Fort Dodge was acquired by purchase from Peterson in 1910. The defendant Edwards entered the plaintiff's employ at that time, and continued his employment in such store down to February 11, 1915. No evidence has been taken concerning the business prior to January, 1912. The charge of the petition is, in substance, that there was a shortage in the defendant's merchandise accounts of about $18,000. This was denied *in toto* by the defendant. Such was the issue under investigation. The record below was very voluminous, and comprised thousands of exhibits. The case was referred to a member of the bar as referee. The trial before the referee occupied 14 days. It will be manifest, therefore, that we cannot, within the appropriate limits of an opinion, enter into a detailed consideration of the evidence.

The contract between plaintiff and defendant provided for the compensation of $75 per month and 10 per cent of the profits. The goods in the store in January, 1912, invoiced something more than $12,000. In February, 1915, when the defendant quit the store, they invoiced something more than $13,000. The evidence in the case is of a very unsatisfactory kind. We are, therefore, concerned at the outset with the query, Which party is chiefly responsible for the absence of evidence? The general burden of proof is upon the plaintiff; but the burden of disclosure and accounting rests upon the defendant also, so far as it appears that the facts to be disclosed are or ought to be within his control. The defendant was called the manager of the Fort Dodge store. It appears, however, that he was a manager with very limited authority. Besides the manager, the

plaintiff employed Hawkins, as assistant manager, and Miss Christopherson as cashier. The latter continued for one year. The plaintiff put in a system of management whereby he himself, at Mason City, kept quite direct charge of the business. In the purchase of goods, all invoices were sent by the sellers direct to the plaintiff, at Mason City. Ordinarily, these invoices would then be sent by the plaintiff to Fort Dodge, for the O. K. of the manager there. These invoices were O. K.'d,—some by Edwards, some by Hawkins, some by Christopherson,—and were then returned to plaintiff. Many invoices put in evidence herein were not O. K.'d by anyone at the Fort Dodge store. These invoices were all kept by the plaintiff,—not by the defendant. All bills were settled by the plaintiff from Mason City. At the close of each day's business, a complete report of sales was made and mailed to the plaintiff, including all sale slips. These sale slips specified the articles sold, the cost mark thereon, and the selling price. The proceeds of the sales were deposited daily in one of the Fort Dodge banks, to the account of the New York Brokerage Company. The money thus deposited was checked out by the plaintiff alone. The daily reports of sales and the sale slips were all retained by the plaintiff. Invoices of the stock were taken in 1913, 1914, and 1915. Based upon the current invoices and the annual invoices and the daily reports, the plaintiff kept a set of books at Mason City, from which he could compute any day the state of the business at the Fort Dodge store. This much he admitted. These books were not produced by him. He kept in his custody complete files of all the invoices O. K.'d by the Fort Dodge employees, and complete files of all the daily sale slips. The daily reports of cash receipts were also sent to him, and the cash was daily deposited to his credit in the Fort Dodge bank. These reports were preserved in files by him. There was bookkeeping done also at the Fort Dodge store, but it did not deal

with details, and was very imperfect, both in system and in practice. The plaintiff was responsible for the system. It is manifest that the real bookkeeping was carried on at Mason City, the original data being all preserved there. The plaintiff had in his custody, then, the original evidence of every item pertaining to the Fort Dodge business. No controversy is presented here over the cash account. The cash deposited concededly corresponds to the sales reported. The controversy here is over the merchandise account only. On the trial below, with the help of experts and otherwise, the effort was to state the merchandise account so as to show the sum total value of the goods put into the store and the sum total value of the goods reported as sold. These values were stated on the basis of the cost mark, and not of the selling price. And this is so even as to the goods sold, the purpose being to ascertain the extent of depletion of the stock, rather than the selling price of the goods. It is evident that the plaintiff had in his custody the original items of evidence which would establish the statement of such an account with certainty, and without need of the aid of an expert. The invoices in his hands would show, not only the *amount* of goods put upon the shelves, but they would show *what* the items of the goods were. The sale slips in his hands would show, not only the *amount* of the sales, based upon the cost mark, but they would show the *very articles* that were sold. Every article carried a stock number, which identified it in the invoice and in the sale slip. From these items of evidence in the hands of the plaintiff, he could have made an invoice of the goods which ought to appear upon the Fort Dodge shelves. A comparison of such hypothetical invoice with the actual invoice taken at the close of the defendant's service would disclose, not simply the *amount* of the shortage, but the *items* of the shortage. In the light of what transpired, this is a very important consideration.

. The plaintiff himself testified that he could have ascertained the shortage in the merchandise any day from his books by "adding a little." Plaintiff's chain comprised six stores. He kept the books and the invoices and sale slips for all of them. He was a large purchaser of bankrupt stocks. He bought these at from 25 cents to 75 cents on the dollar. Stocks so purchased would be distributed to his different stores, and would be invoiced in, not at the price paid, but at the price indicated by old cost marks. Quantities of goods would be transferred from one store to another. In these transfers, the goods were invoiced to the receiving store at cost mark plus 10 per cent. These invoices, too, were kept by the plaintiff. The Fort Dodge store made frequent shipments to other stores. During the period covered by this investigation, bankrupt stocks were purchased by plaintiff to a cost mark value of nearly $30,000, according to his own admission. He was not able to remember the price paid.

In the hearing before the referee, expert accountants were employed, one selected by the plaintiff, and one selected by the defendant. These experts undertook to assimilate and to put into form the data presented, consisting of thousands of exhibits. In the production of data, the plaintiff, as sole possessor, produced the invoices. He produced many that were erroneously charged to the Fort Dodge store, and such erroneous charges were later clearly proven. He produced no invoices for goods shipped by the Fort Dodge store to other stores. Upon the data produced, the final computations of the two experts were more than $7,000 apart, the defendant's expert showing a merchandise deficit of about $4,500; whereas the plaintiff's expert showed a merchandise deficit of over $12,000. The referee adopted the report of the defendant's expert as the more accurate one. This action by the referee was fully justified by the record. The difference of more than $7,000 between

these two computations is fairly representative of the affirmative errors into which the one expert was led by the plaintiff.

With modifications made by the referee therein, we are impressed with the thoroughness and correctness of the report of defendant's expert accountant, in so far as the data before him would permit. The purported deficit of $4,500 spoke in terms of cost mark value. The amount stated did not represent actual value, or actual cost of goods received. There was no evidence of actual value or actual cost. This fact bears on the question of the amount of recovery, if any. It also has its importance as a circumstance to be referred to later. No part of this purported deficit of $4,500 was allowed as a recovery, either by the referee or by the district court. It appears from the evidence, though it is denied by the plaintiff, that he directed his employees to make small gratuities to customers, in order to quicken sales. A shirt, a pair of suspenders, a necktie, a cap, and like articles, were the usual gratuities to purchasers of more valuable articles. All the employees testified that this was a regular practice. They testified that it was done by the plaintiff himself, while in the store, and by his traveling auditor, Nadler. He also directed that no account need be made of such articles, and none was ever made. It became, therefore, a matter of estimate as to how much of a burden such a practice would entail upon the sum total of the sales. Other clothing merchants in Fort Dodge were called as witnesses. They all testified that the practice was universal in Fort Dodge. They estimated that the cost of such practice would run, on an average, about 7 per cent of the sales. It was upon this showing that the referee found that the apparent deficit was sufficiently explained. Our first impression of this showing was a very skeptical one, both as to the probability of the practice and as to the extent of it. The argument against the probability of the

practice is the unreasonableness of it as an item of expense. That would depend, of course, upon the proportion such expense sustained to the profits actually realized. The profits actually realized are not disclosed in the record. The plaintiff, however, testified as follows:

"Well, the profits should not be less than 33⅓ per cent, and on clothing, more. Clothing sometimes is marked double, and according to how clothing looks like—sometimes even more than double."

This testimony doubtless refers to new goods. Bankrupt stocks bought at from 25 cents to 50 cents on the dollar, and carried in stock at the original cost mark, would carry a still larger margin of profit. The sum total of sales was estimated by the experts as between $60,000 and $70,000. These figures are based, not upon the selling price, but upon the cost mark plus 10 per cent. If these sales were made at a profit of from 33⅓ per cent to 100 per cent, then the extent of the gratuities becomes quite insignificant. If they were an effective aid to the larger sales. they were cheaper than advertising. That this practice would result in an apparent deficit is manifest, and the plaintiff knew that, when he directed the practice.

It is to be considered here, also, that the plaintiff had the custody of the data, the invoices, and the sale slips, which would have disclosed the very articles that were missing from the shelves. If the articles involved in the deficit had been listed by the plaintiff, it would throw light upon the question whether the missing articles were of a nature suitable as gratuities. Indeed, the trial of this case could have been rendered quite simple, if the plaintiff had produced such data as was in his hands, and produced them unmixed with the data of other stores. He is not, therefore, in a position to complain of the estimate made of the extent of the gratuities in question.

There is a further consideration that is not without

its bearing upon the disposition of this case. The plaintiff asked for an accounting. He was bound in equity to make an accounting, himself. Under his contract, he was to pay Edwards 10 per cent of the profits. He never paid him any profits, and never made any statement concerning profits. There were no data in the hands of Edwards from which the profits could be estimated. The plaintiff alone knew what he paid for the bankrupt stocks. He alone received the trade discounts. We think it was incumbent upon him in equity to disclose the amount of the profits due from him to Edwards, and to tender it as a credit upon any amount found due him from Edwards. The inference arises quite naturally that his unwillingness to disclose his profits was a reason for his failure to produce his books.

**2. ACCOUNTING: mutuality.**

Taking the case all in all, we reach the conclusion that the petition of the plaintiff was properly dismissed. The testimony of plaintiff has impressed us as wanting in candor. The system adopted by him was calculated to confuse. It was certainly intended to keep all evidence in his own possession, and to disclose as little as possible to his employees. It was not the result of ignorance. The plaintiff is not wanting in acumen or in business ability. With the system adopted by him, he was the only person who could have produced the evidence to disclose the real facts. But he has not been candid in the production of such evidence, and this fact alone would have been sufficient to justify the dismissal of his petition.

II. Some stress is laid in argument for the plaintiff upon the state of the defendant's personal deposit account in the bank, and the alleged failure of the defendant to account for the items appearing thereon. It appears that the plaintiff clandestinely obtained possession of the defendant's bank book. While the defendant was

**3. EVIDENCE: relevancy, materiality, and competency: deposit book.**

testifying as a witness, plaintiff's counsel examined him concerning the items in such book. The book covered a period of three years. It contained more than 100 items, which totaled about $5,100. In the first examination of defendant by plaintiff's counsel, he was able to explain only a few of such items. Later, after he had had an opportunity to check up the items and to refresh his memory, he was re-examined by his own counsel, and was able to give a full account of every substantial item. The few unexplained items were small. The defendant kept a bank account during the entire period of his employment. He claims to have deposited therein all his cash receipts, from whatever source. The deposit items therein which tended most to stimulate suspicion were fully explained by him. The explanations were such that they could readily have been contradicted, if untrue. His explanations as to many of the items were corroborated affirmatively by other witnesses. With such explanation, the state of the evidence does not leave the slightest ground of suspicion that tainted money had found a place in his deposit account. The fact that the defendant could not explain the various items when suddenly confronted with his bank book has very little significance, in the light of his subsequent explanations. If such fact justified the stress laid upon it in argument, many of us might be subject to quick conviction by the same kind of evidence.

The plaintiff was justified in challenging the defendant to an explanation of his deposits. If he had failed to give a satisfactory explanation of his deposits, the circumstance would have been damaging, and would have had a fair tendency to corroborate the claim of shortage. On the other hand, the bank book thus put in evidence by the plaintiff has become an important item of corroboration in favor of the defendant. The bank book was not prepared by him with a view of using it in evidence. He is in no manner

responsible for its introduction in evidence. He kept no other bank account. If he had embezzled $12,000 or $4,500 worth of goods, or the proceeds thereof, it is hardly conceivable that evidence of such fact would not have appeared, to some extent, in his deposit account. He must have had either the goods or their proceeds. If the goods, they were subject to discovery; if the proceeds, he could hardly have avoided depositing them somewhere; if deposited in some other bank, there would have been another bank book, or other evidence of the deposits. The plaintiff secretly obtained access to the private papers of the defendant in the safe wherein they were kept. He could have found two bank books, as easily as one. It is fair inference that he overlooked nothing that might incriminate the defendant. It is a case, then, where the plaintiff gained access to the defendant's inside pockets, and turned them inside out. The result of the investigation of the defendant's deposit account under the challenge of the plaintiff may properly be considered by us. Needless to say, it confirms our conclusion that the defendant appropriated no benefits during his term of service.

An affirmance as to this defendant necessarily works an affirmance as to his co-defendant, also, and we need not deal with that feature of the case. The judgment entered below is, accordingly,—*Affirmed.*

LADD, C. J., PRESTON and SALINGER, JJ., concur.