LINDSAY SMITH, M.D., APPELLANT, v. JAMES JEFFREY COTTER AND BONNIE ELIZABETH COTTER, RESPONDENTS.

No. 20913

April 30, 1991 810 P.2d 1204

_____

*Osborne, Jenkins & Gamboa,* and *Cathy L. Bradford,* Reno, for Appellant.

*Bradley & Drendel,* and *Bill Bradley,* Reno, for Respondents.

## OPINION

*Per Curiam:*

This is a medical malpractice action. After a bench trial, the district court awarded damages against Dr. Lindsay Smith because of his negligent failure to obtain James Cotter's informed consent to a surgical operation, a total thyroidectomy.

Cotter claims that Dr. Smith failed to inform him that he could suffer paralyzed vocal cords and an obstructed airway as a complication of the surgery. Dr. Smith claims that he told Cotter of the risk and that, even if he did not, he was not required by professional standards to tell Cotter of this risk. There is ample evidence to support the trial court's conclusion that Dr. Smith failed to inform Cotter of the risk, that he should have done so, and that this failure was the cause of Cotter's injuries. We therefore affirm the judgment of the trial court.

Cotter suffered thyroid problems for several years and was treated by Dr. Robert Fredericks, who was unable to relieve the symptoms through conservative medical treatment and medication. Dr. Fredericks believed that Cotter might require a total thyroidectomy, and, for this reason, he referred Cotter to Dr. Smith, a general surgeon. On January 16, 1985, Mr. and Mrs. Cotter met with Dr. Smith. Dr. Smith noted in his office chart that he had discussed some of the complications associated with a

total thyroidectomy namely, "infection, bleeding, recurrent laryngeal nerves and parathyroids." The trial judge concluded that neither Mr. nor Mrs. Cotter came away from that meeting with any idea that there was a risk of "total vocal cord paralysis, or permanent voice impairment or permanent airway obstruction." Cotter elected to have surgery, and he was operated on, on January 21, 1985. Following the surgery, Cotter could only speak in a whisper. Initially this did not alarm Cotter or Dr. Smith. Later, Cotter was seen by Dr. Fredericks, Dr. Dooley, an ear, nose and throat specialist, and a speech pathologist, Dr. McFarlane, who started to become alarmed because Cotter was still not able to speak properly. In March of 1985, Cotter was referred to a larynx expert, Dr. Dedo, who concluded that during surgery Cotter sustained an insult to the bilateral recurrent laryngeal nerve resulting in paralysis. The district court concluded from the medical evidence that Cotter could not close his vocal cords to the degree required for normal speech nor could he open his vocal cords to the degree required for normal breathing.

By mid-summer of 1985, Cotter's voice had begun to recover. By the fall some experts, including Dr. McFarlane, believed the injured nerves were showing signs of recovery. Dr. Dedo, on the other hand, attributed the improvement to an expected atrophying process which causes the cords to close slowly into a position approaching that which was necessary for phonation. In March of 1986, Dr. Dedo recommended a tracheotomy because Cotter's airway was obstructed and his vocal cords did not show a return of function. On March 12, 1986, Cotter was examined by Dr. Horgan, a board certified ear, nose and throat doctor in Carson City, who found Cotter's airway obstructed due to vocal cord paralysis. Dr. Horgan agreed with Dr. Dedo's evaluation. Dr. Horgan performed a tracheotomy on Cotter on April 15, 1986.

The district court found that since April 15, 1986, Cotter has suffered a permanent disability as a result of paralyzed vocal cords, an obstructed airway and placement of the tracheotomy tube. Based upon these findings of fact the district court found that Dr. Smith failed to obtain Cotter's informed consent to a total thyroidectomy. The court found that the standard of care for a board certified general surgeon requires the surgeon to inform the patient of the risks of surgical injury to the recurrent laryngeal nerve and of permanent vocal cord paralysis and airway obstruction. There is ample evidence to support these findings.

The trial court also specifically found that "Dr. Smith acted negligently by failing to comply with the requirements of NRS

41A.110[1] and NRS 449.710.[2]" On its face, NRS 41A.110 requires nothing of a doctor. The statute states only that if its provisions are followed, consent has been conclusively obtained; the statute does not state that valid consent can *only* be obtained by following its provisions. Based upon a plain reading of NRS 41A.110, the district court's finding that the statute sets out "requirements" for a doctor to follow is incorrect; nevertheless, the district court's conclusion that the doctor failed to inform Cotter about the surgery in a proper professional manner is justified under the professional standard of care discussed below.

With respect to NRS 449.710,[3] known as the "patient's bill of rights," Dr. Smith correctly points out that the patient's bill of rights does not require written consent. Dr. Smith argues that the district court held him in violation of this statute because he did

---

[1]NRS 41A.110 provides:

Consent of patient: When conclusively established. A physician licensed to practice medicine under the provisions of chapter 630 of NRS *has conclusively obtained the consent of a patient for a medical or surgical procedure if he has done the following:*
1. Explained to the patient in general terms without specific details, the procedure to be undertaken;
2. Explained to the patient alternative methods of treatment, if any, and their general nature;
3. Explained to the patient that there may be risks, together with the general nature and extent of the risks involved, without enumerating such risks; and
4. Obtained the signature of the patient to a statement containing an explanation of the procedure, alternative methods of treatment and risks involved, as provided in this section.

(Emphasis added.)

[2]NRS 449.710 provides in pertinent part:

Every patient of a medical facility or facility for the dependent has the right to:
. . . .
6. Receive from his [or her] physician the information necessary for him [or her] to give his [or her] informed consent to a procedure or treatment. Except in an emergency, this information must not be limited to a specific procedure or treatment and must include:
(a) A description of the significant medical risks involved. . . .

[3]NRS 449.710 provides in pertinent part:

Every patient of a medical facility or facility for the dependent has the right to:
. . . .
6. Receive from his [or her] physician the information necessary for him [or her] to give his [or her] informed consent to a procedure or treatment. Except in an emergency, this information must not be limited to a specific procedure or treatment and must include:
(a) A description of the significant medical risks involved. . . .

not get consent in writing. This is not an accurate reading of the lower court's findings. The district court found that the risks of nerve paralysis, permanent vocal cord paralysis and permanent airway obstruction are "significant medical risks" as that term is used in NRS 449.710(6). The district court correctly concluded that Dr. Smith failed to comply with the patient's bill of rights, not by failing to get written consent, but by failing to inform Cotter of these "significant medical risks" prior to obtaining consent.

The standard relating to informed consent that has been adopted by a majority of jurisdictions, including Nevada, is a "professional" standard under which a doctor has a duty to disclose information that a reasonable practitioner in the same field of practice would disclose. Karp v. Cooley, 493 F.2d 408, 420 (5th Cir. 1974) (applying Texas law); Guebard v. Jabaay, 452 N.E.2d 751, 755 (Ill.App. 1983). Generally, under the majority rule the professional standard must be determined by expert testimony regarding the custom and practice of the particular field of medical practice. Di Filippo v. Preston, 173 A.2d 333, 339 (Del. 1961); Wooley v. Henderson, 418 A.2d 1123, 1130 (Me. 1980). This court has specifically adopted the "professional," standard stating that "the physician's duty to disclose is measured by a professional medical standard, which the plaintiff must establish with expert testimony." Beattie v. Thomas, 99 Nev. 579, 584, 668 P.2d 268, 271 (1983). In following the rule in *Beattie* this court recently declared that a lack of informed consent must be demonstrated through expert testimony based upon NRS 41A.100,[4] which requires expert testimony to prove negligence in medical malpractice actions. Brown v. Capanna, 105 Nev. 665, 669, 782 P.2d 1299, 1302 (1989).[5]

---

[4]NRS 41A.100 provides in pertinent part:

 1. Liability for personal injury or death is not imposed upon any provider of medical care based on alleged *negligence* in the performance of that care unless *evidence consisting of expert medical testimony,* material from recognized medical texts or treatises or the regulations of the licensed medical facility wherein the alleged negligence occurred is presented to demonstrate the alleged deviation from the accepted standard of care in the specific circumstances of the case and to prove causation of the alleged personal injury or death. . . .

(Emphasis added.)

Liability for failure to obtain informed consent is grounded in negligence, in the sense that it is negligent for a doctor to fail to inform patients of certain risks.

[5]Although *Capanna* had not been decided at the time the instant case was at trial, the holding in *Capanna* is consistent with *Beattie* and is a useful clarification of the majority rule as it is applicable in Nevada.

The only expert who testified on behalf of the Cotters on the issue of informed consent was Dr. Knoernschild. When asked his opinion, "based upon reasonable medical probability," as to the proper information to be given by a general board certified surgeon preparing to perform a thyroidectomy, Dr. Knoernschild testified that he "thinks" that the surgeon should "inform the patient of the most hazardous complication of a thyroidectomy: that is, the division of one or both of the recurrent laryngeal nerves and the bilateral vocal cord paralysis or chronology." Dr. Smith argues that this testimony was "no more than an inappropriate personal opinion" and that Dr. Knoernschild never actually testified that Dr. Smith was guilty of a "deviation from the standard of care." In answer to this we would note that this was a bench trial, and the mere use of the work "think" by the expert does not place his expression of expert opinion into a category of conjecture or unreliability. Based upon the question he was responding to, the testimony was reasonably taken by the trial court as an expert opinion on what the standard of care is for a general surgeon performing a total thyroidectomy.[6]

The Cotters argue that Dr. Smith's own admission at trial also tended to establish the standard of care in this case. When asked if "vocal cord paralysis is a significant risk that should be disclosed to a patient before undergoing a total thyroidectomy" Dr. Smith responded, "Yes." It has been held in other jurisdictions that the expert testimony requirement may be met by relying on the testimony of the defendant himself. *See* Abbey v. Jackson, 483 A.2d 330, 333 (D.C.App. 1984) (citations omitted). The testimony of Dr. Smith with regard to what should have been disclosed was rightfully considered in conjunction with the expert testimony of Dr. Knoernschild in determining the standard of care; and we conclude that sufficient evidence was presented at

---

[6]The question asked of Dr. Knoernschild was as follows:

[I]n that discussion, Dr. Smith entered into his chart that he discussed problems with bleeding, infection, recurrent laryngeal nerve and parathyroid.

I would also like you to assume that Mr. Cotter has testified that in the discussion he was told about nerves in his neck that pass through his thyroid, and that if the nerves were damaged, he could suffer possible hoarseness for up to six months.

Do you have an opinion, based upon reasonable medical probability, as to whether that is the proper informed consent that a general Board-certified surgeon should give to a patient when explaining the procedure of a total thyroidectomy?

trial to establish a standard of care. The next question is whether substantial evidence was presented to indicate that Dr. Smith failed to inform Cotter of the risk of vocal cord paralysis and thereby deviated from the standard of care.

Dr. Smith's own records presented at trial indicate that he informed Cotter of various risks ("bleeding, infection, recurrent laryngeal nerve and parathyroid"), but no mention is made of vocal cord paralysis or impaired breathing. Dr. Smith testified that the implication of the note regarding recurrent laryngeal nerve "has to include vocal cord paralysis." He went on to state specifically that vocal cord paralysis was discussed. Mr. Cotter on the other hand testified that prior to surgery Dr. Smith never mentioned the risk of permanently paralyzed vocal cords. Although conflicting evidence was presented with respect to the information given by Dr. Smith, there was sufficient evidence to support the trial court's finding that the doctor failed to inform Cotter of the risk of vocal cord paralysis. The trier of fact was in the best position to sort through the conflicting evidence, and its finding on this issue should not be disturbed.

Dr. Smith also contends that the element of proximate cause has not been established in this case. To establish proximate cause, first there must be a showing that the unrevealed risk which should have been revealed by the doctor actually materialized. Downer v. Veilleux, 322 A.2d 82, 92 (Me. 1974). In the instant case, the unrevealed risk was the risk of vocal cord paralysis and the consequent voice loss and breathing impairment. Although there is conflicting evidence, the district court found that Cotter's vocal cords were paralyzed. Accepting this finding of fact based upon conflicting evidence, the initial requirement for proving proximate cause is fulfilled.[7]

Additionally, it must be shown that Cotter would have refused the surgery if he had been informed of the risk of permanent vocal cord paralysis. Id. The plaintiff's assertion that he or she would have refused the treatment must be reasonable under the circumstances. In determining reasonableness, the court may

---

[7]It is within the trial court's discretion to believe the testimony of one party while disbelieving the conflicting testimony of another party. In fact, it is well settled in Nevada that a trial court, as the trier of fact, can disbelieve testimony even if uncontradicted. Fox v. First Western Savings and Loan, 86 Nev. 469, 470 P.2d 424 (1970).

consider the testimony of the patient as well as medical evidence regarding the risks of remaining untreated, the possible alternative treatments and the risks and expected benefits of alternative treatments. This evidence may also include testimony from witnesses who observed the patients at the time they elected to undergo the treatment. No single type of evidence is to be conclusive; rather, all the evidence must be considered by the fact-finder in determining whether, had the full extent of the risk been known, the plaintiff would have reasonably refused treatment. Credible evidence was presented at trial to support the trial court's conclusion that Mr. Cotter would not have undergone the thyroidectomy if he had known of the risk of permanent vocal cord paralysis. Cotter testified that if he had been told of the risk of permanent vocal cord paralysis he would not have elected to have the surgery. As noted, this evidence is not conclusive, but it can be considered by the fact-finder. Evidence was also presented at trial that Cotter's thyroid problem was only a minor irritant and that it only required medical attention every few months. Further, an abundance of expert testimony (although at times conflicting) was presented on the issue of the risks of a total thyroidectomy. Alternative treatments were addressed somewhat by Dr. Knoernschild who testified that a subtotal thyroidectomy would have created less of a risk of vocal cord paralysis. Also, there was some evidence regarding Cotter's prior treatment and certainly the continuance of that treatment could have been seen as an alternative by the lower court. We conclude that the trial court did not err in finding that the evidence supported the required element of proximate cause in this case.

We affirm the judgment of the district court.