DAVID BRONNEKE, Appellant, v. MARTIN
RUTHERFORD, D.C., Respondent.

No. 40222

May 12, 2004                                    89 P.3d 40

*Law Offices of Terry A. Friedman, Ltd.,* and *Terry A. Friedman,*
Reno, for Appellant.

*Erickson Thorpe & Swainston, Ltd.,* and *William G. Cobb,*
Reno, for Respondent.

Before BECKER, AGOSTI and GIBBONS, JJ.

## OPINION

*Per Curiam:*

Appellant David Bronneke appeals from the district court's order denying his motion for a new trial. Bronneke, a carpenter in his mid-forties at the time of trial, had undergone numerous chiropractic treatments over several years. However, on June 27, 2001, Bronneke suffered a stroke immediately after respondent Dr. Martin Rutherford, a chiropractor, had performed a chiropractic treatment upon Bronneke. Dr. Rutherford had performed a long axis traction technique in which Bronneke had lain faceup on a table; Dr. Rutherford had extended Bronneke's neck, and then, using a rolled-up gown, gave Bronneke's neck an extra tug to re-align the spine. Immediately afterward, Bronneke became dizzy and nauseated. Bronneke vomited and began to suffer nystagmus, a condition in which the eyeballs oscillate involuntarily. Dr. Rutherford drove Bronneke to the hospital emergency room. By that evening, Bronneke still could not walk because of poor balance, and the hospital admitted him. The hospital discharged

Bronneke the next day with a diagnosis of labyrinthitis, an inner ear infection causing dizziness. Several months later, a neurologist diagnosed Bronneke as having had a stroke rather than an inner ear infection.

Bronneke sued Dr. Rutherford for negligence, claiming among other things, that Dr. Rutherford failed to inform him of the risk of stroke before treating him. On the Friday before the trial, scheduled to begin the following Monday, the district court conducted a pretrial hearing to decide Bronneke's motion in limine and to decide an issue of law regarding Dr. Rutherford's liability for failure to obtain Bronneke's informed consent. Dr. Rutherford argued that the informed-consent standard that applies to physicians should be extended to chiropractors. That standard requires an expert to testify that failing to obtain a patient's informed consent before performing a procedure falls below the standard of care. Bronneke argued that the physician's standard should not be extended to the chiropractic field because chiropractic care is largely unregulated and the practice of informing patients of the risks of treatment varies from chiropractor to chiropractor. Bronneke conceded that he could not produce an expert who would testify that it fell below the chiropractic standard of care to fail to inform him of the risk of stroke prior to performing the procedure. The district court ruled that, because Bronneke could not produce an expert to testify to the standard of care regarding informed consent, the informed-consent claim failed as a matter of law.

The case proceeded to a jury trial solely on the issue of negligence. The jury returned a verdict in favor of Dr. Rutherford. After entry of judgment, Dr. Rutherford moved for attorney fees and costs under NRS 17.115(4) and NRCP 68(f). The district court granted Dr. Rutherford's motion and awarded him $21,000 in attorney fees and $13,400.91 in costs. Bronneke moved for a new trial, which was denied. Bronneke now appeals from the district court's final judgment and its orders denying Bronneke's motion for a new trial and awarding attorney fees and costs.

## DISCUSSION

This appeal primarily concerns the district court's pretrial ruling on the legal viability of Bronneke's informed-consent claim. Because this is a question of law, we review the ruling de novo.[1]

Bronneke contends that Dr. Rutherford's argument at the pretrial hearing constituted an unnoticed motion for summary judgment.

[1]*White v. Continental Ins. Co.,* 119 Nev. 114, 116, 65 P.3d 1090, 1091 (2003).

He asserts that he was entitled to notice of the motion and that his due process rights were violated because he had no notice and no time in which to prepare a defense.[2] Bronneke argues that he was prejudiced by the motion because, in trying to respond to an unnoticed oral motion for summary judgment, both the parties and the district court overlooked the fact that he was prepared to prove that Dr. Rutherford failed to obtain any consent at all, obviating the need for expert testimony.

Shortly before trial, Bronneke filed a document styled as a "Motion for Orders in Limine or Instructions." The motion in limine portion corresponded to Bronneke's attempt to exclude from evidence his nineteen years of chiropractic treatment. The district court ruled that Bronneke's nineteen-year history of chiropractic treatment was admissible. The instructions portion corresponded to Bronneke's attempt to persuade the district court to treat chiropractors differently from medical doctors in Nevada by adopting what is known as the patient-oriented standard of informed consent in cases of a chiropractor's alleged negligence. The patient-oriented standard is based upon the information a reasonable patient would want to know before choosing to undergo a medical procedure. This standard requires a factual finding at trial.[3] The standard governing informed-consent cases regarding medical doctors in Nevada is different. It is the professional medical standard,[4] *i.e.*, the physician must decide whether the information is material and should be disclosed to the patient.

First, we decide whether Dr. Rutherford's argument in opposition to Bronneke's motion for instructions should have been considered a motion for summary judgment by the district court. A motion for summary judgment must be served at least ten days before the hearing scheduled on the motion.[5] We have previously reversed an order granting a summary judgment motion where the party was prejudiced because he received notice of the motion with

---

[2]*See Cheek v. FNF Constr., Inc.,* 112 Nev. 1249, 1254, 924 P.2d 1347, 1351 (1996).

[3]*Smith v. Shannon,* 666 P.2d 351, 355 (Wash. 1983) (stating that " '[t]he jury, as lay people, are equipped to place themselves in the position of a patient and decide whether, under the circumstances, the patient should have been told' " of the risk (quoting *Miller v. Kennedy,* 522 P.2d 852, 864 (Wash. Ct. App. 1974), *aff'd,* 530 P.2d 334 (Wash. 1975))).

[4]*Beattie v. Thomas,* 99 Nev. 579, 584, 668 P.2d 268, 271 (1983) (holding that the district court did not err by refusing to give appellant's proffered instruction, which deviated from the traditional view that "the physician's duty to disclose is measured by a professional medical standard, which the plaintiff must establish with expert testimony").

[5]NRCP 56(c).

fewer than ten days before the scheduled hearing.[6] Dr. Rutherford did not notice a summary judgment motion at all.

We conclude that Dr. Rutherford's response to Bronneke's motion in limine cannot be characterized as a summary judgment motion. First, Bronneke, by motion, brought the issue to the district court's attention. Second, Dr. Rutherford's argument did not focus on the absence of a genuine issue of material fact but rather on the legal question of what standard governs the chiropractic profession. Dr. Rutherford indicated that it was too late to bring a motion for summary judgment and that he would likely move, at the close of Bronneke's case, to dismiss the claim for failure to prove a sufficient case under NRCP 41(b). Third, the district court ruled directly on Bronneke's motion for clarification as to the relevant standard by determining that Nevada's common-law standard for physicians rather than the patient-oriented standard, which has never been applied in Nevada, should govern. Fourth, Bronneke conceded that, if the physician's common-law standard applied, he was unable to establish a prima facie case of negligence as to the informed-consent claim because he could not obtain a chiropractic expert who would testify that Dr. Rutherford did not conform to the customary disclosure practices. In light of Bronneke's admission, the district court properly excluded this issue from the jury's consideration.

Even if we were to conclude that the motion was a de facto summary judgment motion, Bronneke's argument that he was prejudiced by lack of notice of the de facto motion lacks merit. Bronneke argues that, had he been given the opportunity to oppose a summary judgment motion, he would have claimed that, by performing the neck manipulation without first obtaining Bronneke's consent, Dr. Rutherford committed a battery.

Consent to treatment may be express or implied.[7] By seeking chiropractic treatment, Bronneke's consent to the particular technique may be implied because "[a]s a practical matter, health professionals cannot be required to obtain express consent before each touch or test they perform on a patient."[8] Therefore, we conclude that notice to Bronneke of a summary judgment motion would not have improved Bronneke's chances of persuading the district court to permit an eleventh-hour amendment to the com-

---

[6]*Cheek,* 112 Nev. at 1254, 924 P.2d at 1351.

[7]*Jones v. Malloy,* 412 N.W.2d 837, 841 (Neb. 1987) (stating that "implied consent may be inferred from the patient's action of seeking treatment or some other act manifesting a willingness to submit to a particular course of treatment").

[8]*Id.*

plaint to add a battery claim. Furthermore, we perceive no prejudice by the lack of notice, as Bronneke himself, by motion, brought the issue to the district court for its determination. He knew that if the district court adopted the common-law physician's professional standard, he was unable to present the required expert testimony.

Bronneke next contends that the district court improperly extended the physician's professional standard to the chiropractic field. He argues that, when this court adopted the physician's professional standard as part of Nevada's common law, we were influenced by NRS 41A.100(1) (1979), which required a plaintiff to prove medical negligence by expert medical testimony.[9] He contends that a similar statute governing chiropractors does not exist, and therefore, the reasoning behind the rule governing physicians does not apply to chiropractors.

Bronneke further argues that applying the professional standard for informed consent to chiropractors would effectively immunize them from liability because no standard exists in Nevada's chiropractic communities for disclosing medical risks to patients, and therefore, a plaintiff would never be able to obtain expert chiropractic testimony that a chiropractor had violated the medical-professional controlled-disclosure standard. He also argues that allowing the chiropractor to decide what risks to disclose is antithetical to the patient's right to self-determination.[10] Bronneke contends that the professional standard imposes a heavy burden on a plaintiff to prove negligence, especially in light of the ''conspiracy of silence'' among fellow practitioners, which, he asserts, is more pronounced in chiropractic cases given the lack of standards and the potential for retaliatory criticism. He argues that the patient-oriented standard obviates the need for medical expert testimony and is, therefore, the superior approach. Bronneke further contends that the jury does not need a chiropractor's testimony to decide whether the information would have been material to a reasonable patient's consent.[11] He further claims that chiropractors are not entitled to the deference given to medical doctors because medicine

[9]*See Beattie,* 99 Nev. at 584, 668 P.2d at 271. The recent version of NRS 41A.100(1) continues to require expert medical testimony to prove medical negligence.

[10]*Smith,* 666 P.2d at 354 (noting that the doctrine of informed consent is premised upon patient sovereignty and the patient's ability to intelligently govern the treatment of his body).

[11]*Id.* at 355-56 (stating that, although expert medical testimony is required to establish the existence of a risk associated with medical procedures, the trier of fact can determine the materiality of the risk without expert testimony because the trier of fact is equipped ''to determine whether a reasonable patient would consider a given risk material'').

is based upon the scientific method, whereas the practice of chiropractic is not scientific.

Dr. Rutherford claims that Bronneke did not adequately preserve this argument for appellate review because Bronneke (1) failed to make an offer of proof, (2) failed to object to Dr. Rutherford's proffered jury instructions, and (3) failed to submit his own jury instructions regarding informed consent. We conclude that Bronneke did adequately preserve this issue for review on appeal. First, Bronneke, by a pretrial motion, sought clarification regarding the standard governing informed consent. The issue was fully briefed, the district court further explored the issue at the pretrial hearing and the district court made a dispositive ruling before trial.[12] Second, the district court's ruling made it clear that the issue should not be presented at trial because it could confuse the jury. Although Dr. Rutherford contends that Bronneke should have made an offer of proof outside of the jury's presence to preserve the issue, an offer of proof is necessary only when it is unclear what evidence the party claiming error would have produced.[13] Since the district court heard at the pretrial hearing the evidence that Bronneke intended to produce regarding the informed-consent claim, an offer of proof was unnecessary. Third, Dr. Rutherford's argument that Bronneke should have proffered jury instructions consistent with his theory of the case is erroneous because any proffer of jury instructions regarding informed consent would have been futile. The jury was not given the opportunity, by virtue of the district court's pretrial ruling, to hear evidence concerning what a reasonable patient might expect to be told before consenting to treatment.

Turning to the merits of Bronneke's arguments regarding the informed-consent standard, we conclude that the district court did not err by adopting the physician-oriented standard of informed consent. In *Beattie v. Thomas,* we affirmed the district court's refusal to give the appellant's proffered jury instruction regarding the alleged failure of a physician to obtain the appellant's informed consent regarding the possibility of early amputation of the appel-

---

[12]*See Richmond v. State,* 118 Nev. 924, 932, 59 P.3d 1249, 1254 (2002).

[13]*See Foreman v. Ver Brugghen,* 81 Nev. 86, 90, 398 P.2d 993, 995 (1965) (" '[I]f the [party] wished to make a record for later appellate review, an offer of proof was required. The record would then disclose what testimony would have been given had the court permitted further questioning.' " (quoting *Charleston Hill v. Clough,* 79 Nev. 182, 190, 380 P.2d 458, 462 (1963) (Thompson, J., concurring in result))).

lant's lower leg in order to save the rest of the leg.[14] We noted that, under the traditional view, "the physician's duty to disclose is measured by a professional medical standard, which the plaintiff must establish with expert testimony" concerning "the customary disclosure practice of physicians in the relevant 'community,' or what a reasonable physician would disclose under the circumstances."[15] We concluded that the district court had properly refused the appellant's proffered informed-consent instruction because: (1) the appellant's instruction deviated from prior holdings that were consistent with the traditional view regarding medical standards of care, (2) NRS 41A.100(1) (1979) was "a general rule requiring plaintiffs to demonstrate the alleged negligence of a physician with expert testimony," and (3) there was insufficient expert testimony to support an informed-consent instruction.[16]

We revisited the issue of a physician's failure to obtain a patient's informed consent in *Brown v. Capanna,* in which the daughters of a patient who had died as a result of surgical procedures alleged that the physician failed to conform to the customary disclosure practice.[17] In a footnote, we noted that appellants and amicus curiae urged the court to adopt the patient-oriented standard, and we expressly declined to do so.[18] We reiterated our adoption of the professional standard in *Smith v. Cotter.*[19]

Bronneke now asks us to apply the patient-oriented standard to the chiropractic field. We decline to do so. While Bronneke strives to discredit the chiropractic profession by calling it unscientific, NRS 634.090 delineates rigorous educational requirements before a chiropractor may receive a license to practice in Nevada, including numerous credit hours in scientific fields such as anatomy, bacteriology, chemistry and toxicology, histology and pathology, among others. Chiropractors are also subject to continuing education requirements under NRS 634.130(3).

Although NRS 41A.100(1), which requires expert medical testimony in negligence actions against physicians, dentists, registered

---

[14]99 Nev. at 583-84, 668 P.2d at 271-72.

[15]*Id.* at 584, 668 P.2d at 271.

[16]*Id.* at 584, 668 P.2d at 271-72.

[17]105 Nev. 665, 666-67, 782 P.2d 1299, 1300-01 (1989).

[18]*Id.* at 669 n.1, 782 P.2d at 1302 n.1.

[19]107 Nev. 267, 272, 810 P.2d 1204, 1207 (1991) ("The standard relating to informed consent that has been adopted by a majority of jurisdictions, including Nevada, is a 'professional' standard under which a doctor has a duty to disclose information that a reasonable practitioner in the same field of practice would disclose. Generally, under the majority rule the professional standard must be determined by expert testimony regarding the custom and practice of the particular field of medical practice." (citations omitted)).

nurses or licensed hospitals, does not name chiropractors, we cannot agree with Bronneke's position that the reasoning for the adoption of the professional testimony standard does not apply to chiropractors. NRS 634.017 defines chiropractic malpractice as "failure on the part of a chiropractor to exercise the degree of care, diligence and skill ordinarily exercised by chiropractors in good standing in the community in which he practices." This definition is remarkably similar to the definition of medical malpractice under NRS 41A.009, which defines medical malpractice as "the failure of a physician, hospital or employee of a hospital, in rendering services, to use the reasonable care, skill or knowledge ordinarily used under similar circumstances." Under these definitions, expert testimony is required, at a minimum, to establish the customary medical or chiropractic practice at issue. The jury, as general laypersons, would not know the customary practice in the profession. Hence, despite that NRS 41A.100 is limited to the medical profession, expert chiropractic testimony would still be necessary to establish malpractice. Since the failure to obtain a patient's informed consent is a malpractice issue, the professional standard, requiring expert testimony as to the customary disclosure practice, applies to chiropractors.[20]

Bronneke's argument that applying the professional standard to the chiropractic field would immunize chiropractors from informed-consent cases is also without merit. Although the Chiropractic Physicians' Board of Nevada admitted that the decision of whether to inform a patient of attendant risks is left to the individual chiropractor in Nevada, Bronneke's own expert witness testified that all chiropractors are instructed at accredited schools that have uniform standards, and therefore, chiropractic treatment is standardized nationwide. The district court recognized that since Nevada has no chiropractic schools and since chiropractic curriculum is standardized, the community in which Dr. Rutherford practices is at least the western United States, if not the entire United States. Thus, even if disclosure of the risks of chiropractic treatment were left to the individual chiropractor's discretion in

---

[20]The application of general medical malpractice law to chiropractors has been recognized in several other states. *See Roberson v. Counselman,* 686 P.2d 149, 152 (Kan. 1984), *modified on other grounds by Delaney v. Cade,* 873 P.2d 175, 185-86 (Kan. 1994); *Tschirhart v. Pethtel,* 233 N.W.2d 93, 95 (Mich. Ct. App. 1975) (noting that "[i]n order for plaintiff to have sustained his burden of proof on this issue of malpractice, he was required to establish, by expert testimony, that defendant breached the standard of care required of him"); *Bakewell v. Kahle,* 232 P.2d 127, 129 (Mont. 1951) (stating that "[n]o good reason exists why, in such cases, the law, as applies to physicians, surgeons, dentists and the like, should not apply to chiropractors"); *Jones,* 412 N.W.2d at 842 (adopting the "professional" rule regarding chiropractic informed-consent cases because it promoted uniformity and was the majority rule).

Nevada, this would not conform to the professional standard if the national customary disclosure standard differed. The record reveals no evidence that Dr. Rutherford's failure to disclose the risk of stroke fell below the national disclosure practice.

Furthermore, given the evidence in the record that risk of stroke is extremely remote following the technique that Dr. Rutherford used, a reasonable chiropractor would not have deemed the risk material enough to require disclosure.[21] Dr. Rutherford elicited testimony from Bronneke's expert witness that the risk of stroke due to a cervical traction manipulation ranged from 1 chance in 400,000 to 1 chance in 6,000,000. Dr. Rutherford's expert testified that the consensus was a 1 in 1,000,000 chance of stroke, but that new studies showed the risk to be about 1 in 5,850,000. Furthermore, even if the district court applied the subjective test, Bronneke did not make an offer of proof at the pretrial hearing or by affidavit that, had he been informed of the risk of stroke, he would have refused treatment.

For the foregoing reasons, we decline to adopt the patient-oriented standard with regard to the chiropractic field and expressly adopt the professional standard for chiropractors. Accordingly, we affirm both the district court's final judgment and its order denying Bronneke's motion for a new trial.

We now turn to the district court's award of attorney fees and costs to Dr. Rutherford. Bronneke argues that the trial court's order granting costs and attorney fees based on Bronneke's unreasonable rejection of Dr. Rutherford's settlement offer should be vacated because the district court erroneously removed the informed-consent claim from the jury's consideration. Because we conclude that the district court did not err by applying the professional standard, this argument must fail. We therefore affirm the district court's order awarding attorney fees and costs.

---

[21]*See Cobbs v. Grant,* 502 P.2d 1, 12 (Cal. 1972) (stating that a physician need not inform a patient of risks ''if the procedure is simple and the danger remote and commonly appreciated to be remote'').